Before we start our business for the day, I'll turn to Judge Hughes for a motion. I have an admission this morning. I'm very pleased to move the admission of one of my clerks, my inaugural clerks. I just finished up my first year on the bench and James has been with me through all the good times and the difficult times. It's helped me struggle through all the very difficult patent cases and other cases. So I very much appreciate his service with me. It's been too short for me, hopefully for him too. You can ask him that. So that said, I move the admission of James Robert Bender, who is a member of the Bar and is in good standing with the High Court of Washington, D.C. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. Congratulations. We enthusiastically welcome you to the Bar. Please stand. Raise your right hand if you saw this letter or yourself as an attorney of counsel in this court. Why do you support the law in this court and the Constitution of the United States of America? Thank you. Congratulations. Welcome to the session. Thank you. First case for argument this morning is 13-1325 Novozymes v. DuPont Nutrition. Ms. DeMarchi, are you ready? Good morning, and may it please the Court. Novozymes has identified two errors made by the District Court below, and I'd like to begin with the first one, which is that the District Court allowed costs under the Making Copies provision of 28 U.S.C. 1920, paragraph 4, that are not in fact allowed by that statute. This is a question of law which, of course, is reviewed in Novo by this Court applying the law of the Regional Circuit, which in this case is the Seventh Circuit. Can I ask you a question before we get any farther into the argument? You've marked the briefs confidential and you've identified the numbers, specific numbers as confidential. Is there any continuing reason for us to respect the confidentiality of the particular numbers? Because, as you can appreciate, it's a little difficult both to talk about the case and also, ultimately, if we need to write an opinion, to write an opinion in the case without making any allusion to the particular numbers that are involved. Absolutely, and Novozymes doesn't consider this material to be confidential. It was marked out of deference to DuPont's concerns. So I would...  So we can treat everything in the briefs as not confidential because I believe that, correct me if I'm wrong, but I believe the only things that were marked as confidential were the numbers. I believe that's correct, Your Honor. Okay, so we can disregard the confidentiality? With respect to the material in the briefs, yes. Okay. Thank you. I'm sorry. No, that's quite all right, Your Honor. So the question that the Court must consider is how would the Seventh Circuit decide this issue? The Seventh Circuit has not had an opportunity to analyze the scope of the making copies provision of Paragraph 4 of Section 1920 since it was amended in 2008. And so the Court needs to look at other sources of information for how the Seventh Circuit would decide. And as it has done in past cases, among the sources the Court will consider are how the Seventh Circuit has treated other provisions of 1920. So we've got the Hecker v. Deer case and the Seventh Circuit. And where does that lead us in terms of knowing where the Seventh Circuit might lie? The Hecker v. Deer case did, in fact, consider briefly Section 1920, Paragraph 4. However, that decision cannot be said to have provided an analysis of the scope of that provision for electronic discovery costs and, in particular, did not consider the full range of activities that are claimed by DuPont in this case as being recoverable costs. So I don't think the Court can draw any conclusions from that case except that what was allowed, as described by the Court, and as we explain in our brief, is certainly within what Race Tires, the Third Circuit case, and Country Vintner, the Fourth Circuit case, and, indeed, this Court's decision in Signici Flint, included in recoverable costs. You rely on extra equipamentos case. Do you – what do you take away from that case? The extra equipamentos case from the Seventh Circuit is quite an important case, and there are a couple of things that are significant in it. First of all, in its analysis of Section 1920 generally, it takes a very narrow view of what a court is required to – what a court is permitted to do under that statute. Looking at the legislative history of the provision in prior Supreme Court cases, it takes a narrow view of compliance with the statutory language and not deviating from it, not extending beyond it. The other thing that's very important about the extra equipamentos case is it describes a preference for keeping costs well-defined and limited, consistent with the legislative history of that provision and the Supreme Court decisions on that. And that is, in fact, one of the decisions, one of the justifications for the decision in that case, in holding that compensation of interpreters should be limited to interpreters and not extended translation, even before the Taniguchi decision reached that result. And another significant part of that case is its rejection, I think, of this idea that just because something may be needed or important in a case, it's not a justification for allowing recovery of costs for that activity. And that theme also is consistent with an earlier case of the Seventh Circuit, which we also cite, which is the Chicago College case, which, again, rejected the notion that because costs are necessary or important or even crucial in a case, that somehow they should be recoverable. So those are important themes in prior Seventh Circuit precedent on Section 1920 that should inform this Court's decision as well. Let me ask you a question, if I could, about the agreement between the parties. Yes. Now, a two-part question. First, what is the role of an agreement vis-à-vis costs as you understand it? That is to say, if you agree to produce in a certain form, does that necessarily translate into requiring costs to be allocated or to be awarded in accordance with what was required to be produced per the agreement? No, Your Honor, it does not. An agreement between the parties in terms of the form of production or other things that they might do in aid of their production or how they might conduct themselves in discovery does not equate to cost shifting, unless there is an explicit agreement to that effect, as there was in the Enri Rico case that this Court considered. Help me then with my understanding of CBT, where we said that the recoverable costs are those necessary to duplicate an electronic document in its faithful and complete a manner as required by rule, court order, or agreement of the parties. That suggested to me that the agreement of the parties might inform the items that would be awardable as costs. What it does inform, Your Honor, is this. If the parties have agreed on a particular form in which the final production is to be made, in this case it was in TIFF format, the particular imaging format. This was the same agreement reached in the race tires case. Then, yes, the cost of producing the document in that format is the recoverable cost. But the agreement that the parties had in this case, as in the race tires case, extended to things beyond what the form of production would be. And that's where I think the Court should draw the line and where it wasn't drawn in CBT-Flint applying Eleventh Circuit law. And that is this. The things that were also part of the parties' agreement in this case, and are frequently part of the agreement in other cases, include things like metadata fields, load files in a particular format, concordance or summation, for example, the extraction of OCR text files. Those kinds of things are things that are not the production itself, but are things that make the production easy to use. And the parties agree that they will cooperate in that process and exchange things that make the production easy to use. But those are not the final production copies themselves. They merely facilitate the use of those production copies. So I think the agreement, to answer your question, that matters is the form of production. So in this case, the parties agreed TIFF format, Excel or other spreadsheet files should be produced in native format. And if there were paper copies, the parties didn't actually explicitly agree, but their practice was that they would scan them. So all of those things are the agreements that dictate what the actual production copy is. Okay, I'm sorry. No, go ahead. Well, you've actually answered the second part of what I was going to ask. Let me move on to one other question. You've listed in your brief at pages 5 through, I believe it is 7, a variety of costs that were awarded, some of which were awarded, many of which were awarded. And you've also identified those costs that you don't contest. Now, if we were, for example, to apply the three categories of CBT to this case, which of the costs that you have identified on those three pages would be awardable under CBT? Would they be, and let me short circuit that question, would they be the costs that you identified as the ones you don't oppose? Or would they be more than that? Let me see if I understand the question correctly. There are a number of costs that are summarized in our brief that come from DuPont's information in its bill of costs to the district court. It is impossible to tell from many of those entries what is happening, or the entries are done at such a high level that they encompass many activities, some of which the CBT Flint court would have concluded were part of the production copies, such as extracting metadata, and some of which certainly would not. But we can't tell from the information. What I'm saying is we could not say, all right, categories 2, 7, 9, and 11 all fit within the categories in CBT that were awardable. We would have to, if we decided that CBT was the model that we wanted to apply, it would require a remit. It would require a remit or vacation, because keep in mind that DuPont has the burden of providing adequate documentation of its recoverable costs, and it had an opportunity to do so below. It even submitted declarations, not a declaration of its vendor, mind you, but a declaration of its practice support personnel, attempting to explain, purporting to explain these costs. But it was done at such a high level that you can't tell what line item or what particular expense relates to what activity. And I would refer the court to the Frost Declaration, which is in the appendix, and in particular, as an example, the explanation of culling, which includes at least three activities and no allocation as between— That is a possibility, Your Honor, and there are courts that have done that. District courts have rejected applications for bill of costs because a party has failed to carry its burden. This court has also found a basis for remand in those situations, as have other appellate courts. Both of those courses are open to you. We would just submit that DuPont had an ample opportunity in the several rounds of exchange of information and briefings. Can I just ask you about the metadata, because you referred to it earlier in the context of it facilitates the use of documents, but it also—metadata can have a use in itself, obviously. So where would we draw the line in, you know, if they're producing—because metadata, at least as I understand it, can sometimes just show who authored a particular document, what time of day, which can be useful in litigation. So it seems like producing a copy of that metadata is a copy under this test, but there's parts of it that may not, and I'm not sure where you would have us draw that line. So metadata, as it's defined in the—not only in our brief, but in the Sedona Conference Glossary that's included in the CBT Flint opinion and is cited in multiple places, describes metadata as data that's typically stored electronically and that describes characteristics of electronically stored information. So based on that definition alone, you would say that's not really the document itself that's being produced. It's information about that document, and if you would consider, for example, the analog paper form— Well, I understand that, but are you saying that—because the metadata is clearly useful, too, but it is part of the document. But that's an accident of the fact that it happens to be electronic information as opposed to a paper. You could imagine— Well, I think that's a hard issue for us, because people are going to want—I mean, you obviously want the metadata when you're litigating cases. People want the identity of the author and stuff, and so why isn't extracting that and making a copy of that a copy within the terms of that? It's no different than if you have a paper document and you have a signature line at the bottom, right? It's the same kind of thing. That's part of the copy. Actually, it's not, Your Honor. I think the analog to the paper document is this. You might have, maybe in a separate document like a spreadsheet, a record of who the authors, recipients, custodians, date of creation are of a particular paper document. That information may be useful, may be desirable, may be produced in discovery at some point through a custodian's deposition, but it is not the paper copy of the document. But if you have a paper copy, if you have a paper log of all that stuff, that's a document in itself, so if you make a copy of it, you get the cost for that. Certainly, but I'm just using that as an analogy. It wouldn't have to be in a paper document. That analogy seems not to work very well, though, because, I mean, if that's analogous to the metadata, then when you copy that paper document, you get a copy. Why not? Do you have a backup position? Because it seems like you're saying nothing associated with metadata comes, but from what the categories here are, it does seem like they're asking for anything associated with the production of metadata that could go beyond just copying the actual information. And I wonder, that's the kind of dividing line I was trying to come up with. I understand you want us to just throw it all out, but if we don't do that, where would you be? Well, two observations. First of all, there's a difference between metadata and what might be contained in load files, which is another concept that has come up in the cases. Load files include a lot of other things beyond metadata. They might include indication of where a document begins and ends and its base number, whether it has an attachment or not. Other things about the document, that is not extracted from an electronic document. That is generated in the production process, again, to make it easy to use. But to come back to one point, which is the reason the statute was changed, which was to go beyond paper and encompass things in other forms, like digital form. If we have a strict interpretation of what that means, I think the analog to paper is important. And things like metadata and load files, they don't have an analog in paper. And I think a fair reading of the legislative history and the committee's intent was not to expand beyond that. I see, Your Honor, that I'm into my rebuttal time. Why don't we hear from the other side, and we'll go for a couple minutes. Thank you. Is it Mr. Valak?  May it please the Court. All of the cost items that are disputed in the appeal here fall into one of three categories. Either they're copying the face of the document, the visible part of the document. They're copying other parts of the document, like metadata or load files. Or there are other necessary components of the cost of making those copies. Now, something like culling, in this case, yes, is a large component for culling. Although, yes, although the culling line item here, Your Honor, includes multiple sub-tasks. It includes deduplication. It includes hashing. And it also includes the actual extraction of metadata. All right. But certainly culling under CBT, at least, would not be allowable. Agreed? Yes, except, Your Honor, what the CBT decision is referring to as culling is different from what the culling line items and invoices here are. Well, I understand. But there is at least, let me put it this way. I take it that there is at least some culling, which was allowed in this case, that would not be allowed in CBT. As well as probably other items, such as the preparatory work and so forth. You would agree that if we applied CBT, you wouldn't get all the money that Judge Crabb has, is it Judge Crabb? It is, Your Honor. Yeah, Judge Crabb has awarded, right? That's correct, Your Honor. Okay. But again, the Seventh Circuit, as we said, Ports and Arborets, does it differently than other courts. Well, that's really the crux of the issue, though, isn't it? Because here's my problem with the position that you've taken. In CBT, we said, we've looked at Eleventh Circuit law, and we've concluded that the Eleventh Circuit would take a restrictive view of the cost statute along the lines of the Third and Fourth Circuits. But when you look at the Eleventh Circuit law that the court relied on, it's not terribly compelling evidence of that. It indicates that the court would take a somewhat narrow view of 1920. Now, if we view, for example, the Estrada Equipamentos case as an indication that the court does not think that 1920 should be read broadly, then it seems to me, and correct me if you think this is the wrong way to look at it, it seems to me the Seventh Circuit is signaling us that we should also, and the Seventh Circuit would, take a narrow view of 1920 with respect to the copying requirement. And so it seems to me that CBT may be what we have done where there's essentially no clear guidance to the contrary from the circuit in question. Why isn't that the correct way for us to look at this case? My response would be twofold, Your Honor. First, with respect to the Extra case, there the court drew a line. It drew a line between costs that were necessary components of something enumerated in Section 1920, even though that cost itself may be separately billed. There, the court held that you could recover the attendance fee for a court reporter, even though the statute itself just talked about the fee for the transcript. And so for invoices that happened to break out a court reporter fee separately from an invoice for a transcript, the Seventh Circuit held that you could recover both because obviously the court reporter's attendance at the deposition was a necessary component of creating the transcript. In contrast, there were other aspects of the court's decision there, the difference between interpreters and written translation, where you didn't have the written translation being a necessary component of oral interpretation. And that was the line that the court drew there, that Judge Poster did in that particular decision. Extra is in accord with the decision that the Seventh Circuit issued in Hecker. There, if you look at the bill of costs from the district court, the costs that were awarded for under Section 1924 included processing, selection, and conversion of the electronic documents. The court said, albeit very briefly, it said that those could be, based upon that record, they could be properly characterized as the cost for the overall process of converting computer data into a readable format that was responsive to the particular request at issue in that case. And so, again, that's how the Seventh Circuit has handled this issue a little bit differently than CBT. They have looked at costs that are necessary components of those that are explicitly defined in the statute, and when those are a necessary component that immediately furthers the enumerated cost, they've awarded that cost as well. If it's not, then they've drawn the line and said, it's not included. Do you have an understanding, either from the text of the Hecker case or perhaps you've looked into the briefs, because this is a very brief couple of sentences on this cost issue, but do you have an understanding as to what the court meant by referring to the cost for document selection as opposed to document processing? Not at the level of granularity that we're talking about here, as opposed to running search terms, calling, and duplication. What the court referred to in the record there, in the bill of costs, is for processing, which included both the selection and conversion of documents. This is, if you look back in the record, which the court referred to in the Hecker decision, if you look in that record, the actual bill of costs, what it says there is that the majority of the awarded costs that were awarded to Fidelity in that case were for processing, and that processing included both selection and conversion of the documents to respond to the plaintiff's discovery request. And selection in the e-discovery, would there be an analogy in the e-discovery setting of what would be selection of documents? I don't think there's any other way to read that but it's running search terms, Your Honor. That's typically how it is. Running searches, you say. Correct. Running search terms. And there's not really, where at here, the parties had agreed upon a methodology for production, that is that we would image hard drives and that we would run search terms across custodian sets. And we took NovoSign's search terms and they took ours, and we ran them, and that's how we were able to identify the particular production set that was ultimately produced. There's no good paper analog for that. We could not run those searches without first collecting the data, copying those hard drives, and then copying the data again into the vendor system, which provided the technological means in order to be able to run those search terms. And then once it was in the system, we were able to extract out the metadata, which had to be produced under the parties' agreement. For certain documents that weren't already text searchable, we copied the text. That's the process of OCR, optical character recognition. And so that had to be done for certain documents, copying their text so that they could be text searchable, because, again, the parties had agreed that that was required in this case. The load files had to be created as well, again, by party agreement. Now that brings me back. I guess you've given an answer already, perhaps, but I want to get it as explicit. The same question that I asked Mr. DeMarti. Do you think the agreement dictates the scope of the award? Yes, Your Honor, but in this way. It dictates the scope of costs that needed to be incurred in this case for making copies. Well, it certainly does that. I mean, the parties had an obligation per contract to make copies in accordance with the agreement, but does that necessarily translate into an award of costs under the statute? It does, Your Honor. Let me give you an example that will maybe tease out where my concern is. Suppose the parties agreed that they would provide ten copies of every document to one another. Would the cost award necessarily cover the production of ten copies, or would that simply be an agreement that, for convenience, the parties will provide ten copies, but the ultimate award of costs will be limited to the statutory requirement of one copy? Respectfully, Your Honor, in the Seventh Circuit, there is not a statutory requirement for just one copy. You can look at the Cullimani case, which is a case that— Hypothetically, let's suppose. I'm not saying the statute necessarily does that, but if a court were to conclude that the statute only required a cost reward for one copy, but the parties agreed to produce ten copies, would that constitute, in effect, an agreement that would translate into an obligation to award costs up to the ten? Yes, Your Honor, and this is why. The statute says copies that are necessarily obtained for use in the case. That necessarily obtained for use in the case part is something that is— it's a finding that is submitted to the discretion of the district court to make. In cases like Cullimani and Majeski say that the district court has broad discretion, and specifically in Cullimani, Judge Easterbrook says that in instances where more than one copy was required, for example, if the court required multiple copies, or in your hypothetical, if the parties agreed that there would be ten copies required, then the district court, in its discretion, can make a finding that that was necessary for use in the case. Here, the clerk and the district court affirmed the finding that all the copying we did here, the collection, the copying into the database, and then the copying of the ultimate production set through all these processes that we've mentioned, that they were reasonable, they were necessary, because the parties had agreed both to a production format and a methodology for that production. You mentioned Judge Easterbrook's opinion in Cullimani, was that it? Yes, Your Honor. How does that spell? It starts with a K. It's cited in Melvin's reply brief. Oh, in the reply brief. All right, well, if it's cited in the reply brief, I'll find it. Thank you. Yeah, it's on page 24 of their reply brief. It's K-U-L-U-M-A-N-I. I was looking in your brief, and I didn't see it. No, for that proposition, Your Honor, we cited Majeski, which holds very specifically that the issue of whether or not a particular cost was necessarily obtained for use in the case, that language appears in multiple provisions, that that is committed to the discretion of the district court. And here, Your Honor, you asked a question about the various costs that are identified, the various line items that are identified in Novozyman's brief. A number of those line items, even if this court were to hold that the line has already been drawn in CBT and that applies here, a number of those items very clearly include costs that would be recoverable under CBT. The calling line item we referred to earlier is one of the more significant ones. The Frost Declaration that Mr. Markey alluded to said specifically that line item includes the cost of extracting the metadata. Other line items there include things like data collection, as well as hardware expenses that were associated with that data collection. The vendor had to purchase hard drives to go out and actually copy the custodian's hard drives onto, and so that's that hardware cost there. How is that recoverable? I mean, the paper analog to that would be you get to recover the cost of the copiers, but that doesn't seem permissible. It's different. It would be more analogous, Your Honor, to the actual paper, which would be part of the cost of copying. The digital information on the custodian's hard drive had to be copied onto another hard drive, and so that hard drive functions a lot like paper would in the paper context. Well, how about something like project management? So the project management fee, Your Honor, is the hourly cost of the vendor for doing all of the tasks that they did. So it includes the hourly time that the vendor spent on things like processing the data, TIF conversion, collecting the data. It also includes other things that the vendor did. But that wouldn't be recoverable under CBT, I don't think, would it? It would, Your Honor, to the extent that it related to, and it was hours that the vendor's personnel spent specifically on those tasks that are recoverable under CBT. So just because— This category, I take it, is not limited to those— It is not, Your Honor. At most, some of that would be recoverable and some would not. That's correct. And Fred alluded to the fact that if you haven't—I mean, I presume you have not necessarily in all categories laid it out in a way that would readily be applicable to CBT categorizations, right? No, Your Honor, we did not. Because, again, at the time that we were doing this, CBT hadn't been issued. And is it your view that you've somehow, if there is a remand, if there were to be a remand in this case, forfeited or waived the right to go back and do that? Absolutely, Your Honor. And that's what this Court did, actually, in the RICOA decision. There, there was an issue over the documentation that the prevailing party had submitted to show for copying costs. And what the Court held there was that it looked like from that documentation that the prevailing party was not entitled to all of the copying costs they'd asked for. But at the same time, they were entitled to more than the other party was conceding. And so the Court remanded, and it specifically said that on remand the district court could consider additional evidence in the form of affidavits or documentation from the vendor. I just have a few remarks in rebuttal. First of all, I wanted to make sure that the Court was aware that not only are the cost categories that are reproduced in our brief and are in the record from DuPont's invoices not broken down by particular activity that might fall under the CBT Flint regime. They're also not allocated by actual production copies. So, for example, TIF format conversion is necessarily the documents that were converted for production into format. But this idea of culling or metadata extraction or any of the other pre-production processing, CBT Flint would have required that to be allocated by whatever percentage was actually produced from that material. And in DuPont's documentation, there is no such allocation of those pre-production costs to what was actually produced. And it was a very, very small fraction of their material that was actually produced to us. So I wanted to make sure that was clear. The second observation I have, based on counsel's remarks, are that the notion that the District Court has broad discretion here is no longer a tenable position. To the extent that this Court may read some of the earlier Seventh Circuit cases as holding that, that is no longer a tenable position after Taniguchi, after the 2008 amendments and the comments in the legislative history and from the Judicial Committee that authored those amendments and suggested them to the legislature. So we would urge the Court to follow the race tires decision and the emerging consensus around the scope of recoverable costs for making copies of materials under Section 1920, Paragraph 4. And unless the Court has other questions for me, I'll move on. Thank you. Thank you. Both counsel and the case is submitted.